IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| JOSEPH GILL, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| v. | ) | Judge |
| | ) | |
| CITY OF MILWAUKEE, Milwaukee Police Chief | ) | |
| EDWARD FLYNN, Milwaukee Police Assistant Chief | ) | |
| EDITH HUDSON, Milwaukee Police Sergeant | ) | |
| JASON MUCHA, and Milwaukee Police Officers | ) | |
| MICHAEL VAGNINI, JACOB KNIGHT, LOUIS | ) | |
| KOPESKY, BRIAN KOZELEK, | ) | |
| AMY BARTOL, STEPHANIE SEITZ, | ) | |
| and any other Milwaukee | ) | |
| Police Officers and Employees yet to be named, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | Jury Demand |

## COMPLAINT

Plaintiff JOSEPH GILL, by his attorneys, THE SHELLOW GROUP and ROHDE
DALES LLP, for his complaint against Defendants CITY OF MILWAUKEE, Milwaukee Police
Chief EDWARD FLYNN, Milwaukee Police Assistant Chief EDITH HUDSON, Milwaukee
Police Sergeant JASON MUCHA, and Milwaukee Police Officers MICHAEL VAGNINI,
JACOB KNIGHT, LOUIS KOPESKY, BRIAN KOZELEK, AMY BARTOL, STEPHANIE
SEITZ, and any other Milwaukee Police Officers and Employees yet to be named, state:

### Jurisdiction and Venue

1.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation
under color of law of Plaintiff's rights as secured by the United States Constitution.

2.      This Court has jurisdiction over federal claims pursuant to 28 U.S.C. § 1331 and

1

state law claims pursuant to 28 U.S.C. § 1367.

3.    Venue is proper under 28 U.S.C. § 1391(b). Defendant City of Milwaukee is a municipal corporation located within this judicial district. Additionally, the events giving rise to the claims asserted herein occurred within this judicial district.

**Parties**

4.    Plaintiff Joseph Gill is an African-American resident of the State of Wisconsin and the City of Milwaukee.

5.    Defendant City of Milwaukee is a Wisconsin municipal corporation and is or was the employer of the individual police officer defendants and is required to pay any tort judgment for damages for which its employees are liable for acts within the scope of their employment. Defendant City of Milwaukee is additionally responsible for the policies, practices, and customs of the Milwaukee Police Department.

6.    Defendant Edward Flynn is and was at all times relevant to this action, the Chief of the Milwaukee Police Department, acting under color of law and within the scope of his employment. Defendant Flynn is being sued in his individual and official capacity.

7.    Defendant Edith Hudson is an Assistant Chief of Police of the Milwaukee Police Department, and was at all times relevant to this action, the Captain of Milwaukee Police District 5, acting under color of law and within the scope of her employment.  Defendant Hudson is being sued in her individual capacity.

8.    At all times relevant to his action, Defendant Jason Mucha was a sergeant in Milwaukee Police District 5 assigned to the proactive power shift unit, who acted under color of law and within the scope of his employment. He is being sued in his individual capacity.

9.    At all times relevant to this action, Defendants Michael Vagnini, Jacob Knight,

Louis Kopesky, Brian Kozelek, Amy Bartol, and Stephanie Seitz were employed as police officers in the Milwaukee Police Department. Each of these Defendants is sued in his or her individual capacity.

## September 2011 Stop and Search of Joseph Gill

10.     On or around September 24, 2011, Joseph Gill was driving an automobile in an area of Milwaukee near the intersection of 25th Street and Hampton Street when his automobile was stopped by Defendants Michael Vagnini, Jacob Knight, Louis Kopesky, Brian Kozelek, Amy Bartol, Stephanie Seitz, and several other as-of-yet unidentified Milwaukee police officers.

11.     Defendants Vagnini and the other officers had no reasonable suspicion or probable cause to believe that Joseph Gill had committed, was committing, or was going to commit any offense when they stopped him.

12.     Defendant Vagnini ordered Joseph Gill to get out of his automobile.

13.     Defendant Vagnini, who had no reasonable suspicion or probable cause to believe that Joseph Gill possessed contraband on or about his person, then, in a public thoroughfare, with no privacy, reached his hand inside the back of Joseph Gill's shorts and underwear, slid his hand between Joseph Gill's bare buttocks and penetrated Joseph Gill's rectum with his finger.

14.     Defendants Jacob Knight, Louis Kopesky, Brian Kozelek, Amy Bartol, and Stephanie Seitz, who were well aware of Defendant Vagnini's modus operandi, pattern, and practice of conducting such invasive and unreasonable searches on African American men, stood by, watching, and took no action to intervene and prevent or stop Defendant Vagnini's invasive and unreasonable search of Joseph Gill, even though they had the duty, ability, and opportunity to do so.

15.     Joseph Gill did not consent to Defendant Vagnini's invasive and unreasonable

3

search.

16.     Defendant Vagnini did not have a warrant to conduct the search, and did not have authorization from a Captain of police.

17.     Defendant Vagnini is not a health care professional, and he conducted the invasive and unreasonable search in an unsafe, unhygienic, and intentionally humiliating fashion.

18.     Defendants Vagnini, Jacob Knight, Louis Kopesky, Brian Kozelek, Amy Bartol, and Stephanie Seitz made out false and incomplete official reports and gave a false and incomplete version of the events to their superiors and prosecutors in order to cover up their misconduct.

### Facts Related to the City of Milwaukee and Its Police Department's Unconstitutional Policies, Practices, and Customs

19.     Milwaukee Police District 5 is located in a community that is approximately 90% African American.

20.     During the time period of 2008 to 2012, a small group of police officers within District 5 were assigned to a proactive unit on the Power Shift whose mission was to heighten its presence in, and concentrate on, "high-crime" neighborhoods.

21.     The unit utilized a policing technique that was known in the community as "the train" because the District 5 officers would patrol the predominantly African American "high crime" areas of the District in a line of several police cars, and would accelerate the number of traffic stops, field interviews, arrests for minor offenses, and consequently, searches, in those areas.

22.     This "proactive policing," which encouraged and rewarded high volume traffic stops, field interviews, searches and arrests in the African-American "high crime" neighborhoods of District 5, as well as the Unit itself, was part of a conscious policy of the MPD and its police

4

Chief Edward Flynn that was known as CompStat.

23.     The District 5 proactive Power Shift Unit, whose hours were 7 p.m. to 3 a.m., was supervised by Defendant Sergeant Jason Mucha, and included among its members: MPD officers Michael Vagnini, Jacob Knight, Paul Martinez, Shawn Burger, Brian Burch, Paul Vento, Daniel Vandervest, William Fely, Jeffrey Cline, Lori Kowalefski and Joseph Szcyubialka.

24.     No African-American officers were assigned to the proactive Power Shift Unit.

25.     Defendant Vagnini would typically ride in the lead car of the train, and was considered the *de facto* leader of the Unit.

26.     Defendant Mucha often rode in the back of the "train."

27.     The conscious purpose of the "train," according to its creator, MPD Captain Glenn Frankovis, and adopted by Sergeant Mucha, was to make the lives of "thugs" "miserable," while the Unit itself was a tool of CompStat.

*Pattern of Illegal Searches by Vagnini and His Power Shift Unit*

28.     From 2007 to March of 2012, Defendant Vagnini and his fellow District 5 officers, particularly those on the Power Shift Unit, were involved in a pattern of conducting illegal strip and body cavity searches that total at least 70 incidents from the fall of 2007 to March of 2012.

29.     The first documented instance of Vagnini conducting an illegal body cavity search occurred on October 9, 2007, when he and another officer made a traffic stop which resulted in the arrest of D.E.

30.     District 5 Sergeant Gregory Flores conducted an administrative review related to Vagnini's use of force during the arrest of D.E.

31.     As part of the administrative review, Sergeant Flores interviewed Vagnini and

5

D.E. concerning the incident.

32. Vagnini told Flores that during his pat down search of D.E. he "felt a bump in between [D.E.'s] legs," and D.E. told Sergeant Flores that Vagnini "was digging in my ass."

33. Lieutenant Kurt Leibold and Acting Deputy Chief Edward Liebrecht reviewed the reports concerning Vagnini's search of D.E.

34. Lieutenant Leibold, who was acting Captain of District 5 at the time, and later became an Assistant Chief, did not open an administrative or criminal investigation into Vagnini's search of D.E.

35. From June of 2008 through February of 2010, in addition to the illegal searches of the Plaintiffs as set forth above, Defendant Vagnini conducted, *inter alia*, the following known illegal strip and body cavity searches on African-American men that he and his fellow Unit officers had stopped. Each time, Vagnini was accompanied by other members of the power shift's proactive Unit:

- April 21, 2008          Joe Bohannon
- June 13, 2008           Carlando Mukes
- April 21, 2009          Chaze Biami
- July 31, 2009           Chavies Hoskin
- December 3, 2009        C.M. and J.B.
- December 31, 2009       Calvin Howard
- January 12, 2010        Calvin Howard
- February 17, 2010       J.A.E.

36. On March 5, 2010, L.L.R., an African-American male, filed a complaint with the MPD against Vagnini, asserting that Vagnini subjected him to an illegal body cavity search.

37. L.L.R. alleged that on February 27, 2010, he was pulled over by Vagnini, that Vagnini placed him in a chokehold, put his hand inside L.L.R.'s pants between the cheeks of his buttocks, probed around the area of his anus, causing bleeding, and removed a plastic bag containing crack cocaine.

6

38.     The MPD's Professional Performance Division (PPD) conducted a criminal investigation into L.L.R.'s complaint and in December of 2010 classified it as "unsubstantiated."

39.     From April of 2010 through March of 2011, in addition to the illegal searches of the Plaintiffs as set forth above, Vagnini conducted illegal strip and/or body cavity searches, *inter alia*, on the following African-American men whom the proactive Power Shift Unit had stopped:

- April 30, 2010          W.N.
- June 5, 2010            Jimar Williams
- July 24, 2010           W.C.
- August 3, 2010          Rico Williams
- November 5, 2010        A.H., R.R. and Chris Barbosa
- Nov. or Dec. 2010       W.C.
- February 2011           S.J.
- March 3, 2011           C.J.

40.     On March 9, 2011, M.T. made a citizen complaint against Defendant Vagnini, alleging that Vagnini subjected him to an illegal body cavity search.

41.     M.T. alleged that on March 8, 2011, he was a passenger in a vehicle that was stopped by Defendants Vagnini and Mucha.

42.     M.T. alleged that Vagnini put his hand inside his underwear from behind and ran his hand upwards between his butt cheeks and placed a finger into M.T.'s anal cavity.

43.     The MPD conducted a criminal investigation into M.T.'s complaint, determined that there was probable cause to charge Vagnini with a crime, and presented the case to the Milwaukee County District Attorney's Office for consideration of possible prosecution.

44.     From April of 2011 through February of 2012, in addition to the illegal searches of the Plaintiff as set forth above, Vagnini conducted, *inter alia*, the following allegedly illegal strip and body cavity searches on African-American men that he and his fellow Unit officers had stopped:

7

- April 11, 2011      B.C.
- April 21, 2011      Michael Teague
- May 9, 2011      M.T.W.
- May 20, 2011      K.J.B.
- May 20, 2011      D.B. and T.D.
- June 1, 2011      F.P.
- July 7, 2011      S.D.W. and Q.C.
- July 7, 2011      C.J.
- July 9, 2011      Chaze Biami
- July 29, 2011      S.D.W.
- July 29, 2011      R.E.P.
- August 11, 2011      B.S.
- August 18, 2011      S.D.W.
- September 3, 2011      D.P.
- September 30, 2011      D.B.
- November 6, 2011      A.P. and J.E.
- December 2011      X.H.
- December 15, 2011      M.W.
- December 16, 2011      Kevin Freeman
- December 30, 2011      Devonte Guercy and M.C.
- January 28, 2012      A.W.

45. On January 31, 2012, B.C. and R.M. made citizen complaints to the Fire and Police Commission (FPC) against Vagnini, alleging illegal body cavity searches.

46. FPC Executive Director Michael Tobin referred the complaints to the Special Investigations Section (SIS) of the MPD's Professional Performance Division (PPD), which opened criminal investigations.

47. MPD Lieutenant David Salazar, who was in charge of the criminal investigations, recognized that there was a pattern of illegal searches after he received these complaints.

48. Defendant Vagnini received a total of at least 47 citizen complaints alleging that he conducted illegal body cavity and/or strip searches. All of Vagnini's victims were African American.

*John Doe Investigation and Stripping of Police Powers*

49. On March 2, 2012, Defendant Vagnini was informed by SIS Lieutenant Salazar of

8

the MPD's PPD that he was under criminal investigation for illegal strip searches and sexual assaults, and that he was not to discuss the investigation.

50.     Milwaukee Police Officer Jacob Knight was similarly informed.

51.     Shortly thereafter, the Milwaukee County District Attorney's Office initiated a secret John Doe proceeding to investigate allegations of illegal body cavity and strip searches.

52.     On March 20, 2012, Defendant Vagnini, Sergeant Mucha, Officer Knight, Officer Kopesky, Officer Cline, and Officer Zachary Thoms, were stripped of their police powers, with pay, and reassigned. Officer Dollhopf and Unit officer Kozelek were stripped of their police powers two months later.

53.     On March 21, 2012, Milwaukee Police Chief Edward Flynn held a press conference where he acknowledged that the MPD had received complaints of illegal strip and body cavity searches "a couple of years ago," but did not begin an investigation into the complaints because it "did not pick up a pattern," a pattern that Flynn has now admitted existed.

54.     In the ensuing days, Vagnini, Mucha, and some of the other suspended officers met on several occasions, including on March 28, 2012, when they met in a park and, in violation of a direct order from Chief Flynn, discussed several of the cases that were under investigation.

55.     At this time Sergeant Mucha suspected that Unit officer Thoms might be cooperating with the investigation, as did Vagnini.

56.     On April 3, 2012, District 5 Sergeants Mucha and Zieger were informed that Vagnini was very drunk, and acting irrationally at a local bar.

57.     Mucha requested that several Unit officers, including Thoms and Paul Martinez, find Vagnini.

9

58.     That very morning, Thoms had agreed to cooperate with the investigation in exchange for immunity from prosecution.

59.     During this time, Vagnini fought with his fellow officers, called Thoms a "snitch," and punched both Thoms and Martinez.

60.     That night Vagnini sent a cell phone text to Thoms in which he called him a "snitch motherfucker."

61.     Shortly thereafter, a bullet was anonymously placed in Thoms' police locker.

62.     No officer reported Vagnini or any of the Unit members for any of the more than 60 alleged illegal strip and cavity searches, and the conspiratorial meetings were of concern to Lt. Salazar, who was in charge of the criminal investigation, because the officers could have been getting their stories together.

*Prosecution and Conviction of Vagnini, Knight, Dollhopf, and Kozelek*

63.     On October 8, 2012, after the John Doe investigation concluded, Vagnini, Knight, Dollhopf, and fellow Unit officer Kozelek were charged with multiple felonies and misdemeanors related to illegal body cavity and strip searches.

64.     In April of 2013, Defendant Vagnini pleaded no contest to four felony charges of misconduct in public office and four misdemeanor charges of conducting illegal strip searches on L.L.R., S.D.W., D.B., and W.C., was found guilty of these charges, and was sentenced to 26 months in prison and 34 months of extended supervision.

65.     In July of 2013, Officer Knight pleaded no contest to one misdemeanor count of being party to the crime of Vagnini's illegal strip search of D.B. and was sentenced to 20 days in the House of Corrections, ordered to pay a $300 fine, and complete 60 hours of community service.

66.     In October of 2013, Officer Dollhopf and Officer Kozelek both pleaded no contest to one misdemeanor disorderly conduct charge of being a party to Vagnini's crime of illegal strip search, Dollhopf was sentenced to 100 hours of community service and ordered to pay a $300 fine, and Kozelek was sentenced to 20 hours of community service and ordered to pay a $300 fine.

67.     At his sentencing, Vagnini, through his lawyer, made numerous admissions, including that Vagnini "accepts it was wrong. He violated the rights. He deserves to be punished."

*Defendant Mucha and Vagnini's Disciplinary and Psychological Histories*

68.     Jason Mucha was hired by the MPD in 1996 as a police aide with a bare bones application and no psychological screening.

69.     As a police aide, Mucha received a one day suspension for underage drinking.

70.     Mucha was promoted from police aide to police officer in early 2000 with no additional application process or psychological screening.

71.     Several months later, while he was in the training academy, Mucha was stopped by police while he was off-duty and charged with having an open vodka bottle by his feet in his car.

72.     Mucha was found guilty by a judge, was ordered to pay a fine, and was given a three-day suspension by the police department.

73.     At a deposition, Mucha claimed that the officer who stopped him lied about where she found the bottle.

74.     Between 2000 and 2004, Mucha was involved in at least 27 incidents of alleged excessive force, theft, and planting of drugs.

11

75.     The vast majority of these incidents arose in 2003 and 2004 while Officer Mucha was working at District 3 as a member of a proactive Unit, which, according to former MPD Chief of Police Nannette Hegerty, was disbanded in early 2004 due to "problems" with citizens' complaints, though, according to Mucha, the name was changed and the Unit continued to function in the same manner.

76.     Mucha was not disciplined for any of these incidents, but rather was promoted to Sergeant in 2005 with Chief Hegerty's blessing.

77.     In August of 2005, a Milwaukee County Circuit Court Judge ruled that several persons who had accused Mucha of using excessive force and/or planting drugs could testify in a criminal case where the defendant made similar accusations against Mucha.

78.     In March of 2006, the Wisconsin Court of Appeals decided that another criminal defendant could use evidence of Mucha's previous disciplinary history at his re-trial.

79.     The MPD conducted investigations, both criminal and administrative, in each of the 27 cases and cleared Mucha, both criminally and administratively, in each and every case, including in all of the 10 complaints set forth in the court cases.

80.     In January of 2008, Mucha went to the website of one of the lawyers who represented one of his alleged victims and wrote an anonymous email addressed to "goodjobfuckingasshole."

81.     In a follow-up email he called the lawyer an "ambulance chaser," called his accusers "thugs," and ridiculed the lawyer's representation of the accusers.

82.     After the MPD charged him administratively with being discourteous, Mucha wrote a letter of explanation directly to Chief Flynn, in which he defended his conduct and apologized only for the unfavorable publicity he brought on the MPD and himself.

12

83. He asserted that he was under a great deal of stress due to all the previous allegations, and that he had considered resigning from the force.

84. Nonetheless, Defendant Chief Flynn, who was aware of Mucha's prior disciplinary history, only issued a reprimand, did not remove Mucha as a supervisor of the proactive Power Shift Unit at District 5, or order any specific re-training, counseling, or closer monitoring.

85. As supervisor of the proactive Power Shift Unit, Defendant Mucha was in charge of evaluating Defendant Vagnini and the rest of the Unit, whom he repeatedly praised, and also of investigating use of force reports filed by his Unit, which he always found justified.

86. From 2008, when the proactive Power Shift Unit under Sergeant Mucha was initiated by Lieutenant Michael Brunson and Captain Edith Hudson, until March 20, 2012, when Mucha, Vagnini, and most of the entire Unit were stripped of their police powers, Mucha was present for numerous illegal strip and body cavity searches by Vagnini and his Unit, as well as, on at least two occasions, when force was used.

87. Mucha's direct supervisors at District 5, including Lieutenant Brunson, Captain Hudson, and Lieutenant McGillis, were aware of Mucha's background, yet consistently gave him glowing evaluations, lauding him for the number of stops and arrests his Unit made, and Lieutenant McGillis even encouraged him to seek promotion to lieutenant during the very time period when the illegal strip searches were taking place.

88. In July of 2012, Mucha applied for and received duty disability based on his claim that newspaper publicity regarding his long history of misconduct complaints, starting in September of 2007, left him paranoid, depressed, suicidal, and under extreme stress.

89. In his disability application, Mucha admitted that he had job-related mental-health

13

issues since 2007, which included paranoia and extreme anger.

90.    Mucha further admitted that, as a result of the mental trauma he had suffered, he could not "pursue suspects, detain suspects or criminal defendants or determine whether subordinates have pursued or apprehended properly, fight with or control prisoners because of my inability to determine who is a criminal or prisoner or determine whether subordinates use the appropriate amount of force."

91.    He further stated that he could not "respond to my fellow officers who need assistance due to my inability to discern when they need help or when to use my firearm," and that he could not "investigate major crimes due to my inability to ascertain facts/details or whether subordinates have conducted a thorough or proper investigation for prosecution." He further stated that he could not "interview witnesses, suspects, or subordinates and reduce to writing facts because of my inability to reduce that which I don't understand and [am] unable to analyze the truth."

92.    Finally, he stated that:

I can't protect the Constitutional or civil rights of innocent persons due to my inability to focus through circumstances and variables that change minute to minute in policing. Supervision of those that are dedicated to protect our Constitutional Rights and Civil Rights is the cornerstone of public policing and not being able to supervise this function places too many people in harm's way. Any amount of stress I have to endure [redacted] and my mind goes into a state of panic.

93.    According to MPD Lieutenant Jackson, in October of 2012, Mucha told a psychiatrist that he had thoughts of "suicide by cop" and dreamed of attending a department command staff meeting with a rifle and shooting up the command staff until he was shot.

94.    As a result of this statement, MPD Tactical Unit members placed Mucha into Emergency Detention, and transported him to a Mental Health Complex where he was detained

for several days.

95.     Despite the fact that the MPD had several open administrative investigations concerning Mucha's supervisory conduct during the strip search/body cavity search cases, as well as concerning whether he and his Unit members violated a direct order of the Chief of Police by meeting and discussing the accusations against them, Mucha was placed on disability, with the right to return to active duty sometime in the future if found competent.

96.     Before Defendant Vagnini was hired by the MPD, he was a dispatcher with the West Allis Police Department and lied about his residence to get the job.

97.     While working for the West Allis Police Department, he had alcohol problems, had drunken driving accidents, and sexually harassed and sexually assaulted a female West Allis police officer by calling her highly derogatory names, by making unwanted advances, and by grabbing her breast in the presence of several other West Allis police officers.

98.     Despite the fact that there was a complete disciplinary file with numerous witness statements documenting the sexual assault and harassment that was available to the MPD at the time Vagnini applied to become a Milwaukee Police Officer in 2004, the MPD accepted Vagnini's false and incomplete recitation of the events, did no further investigation, and hired him without Vagnini submitting to clinical interview conducted by a psychiatrist or psychologist.

99.     As an MPD officer he was accused of being a racist, an alcoholic, and a pathological liar.

100.     In November of 2007, Vagnini made highly sexually-degrading comments to, and in front of, a female correctional officer for which he was verbally counseled by an MPD police sergeant.

101.     In 2008, Alderman Joe Dudzik received a citizen complaint from a neighbor of

15

Vagnini's, which he passed on to MPD Assistant Chief Strunk with the admonition that "we don't want this to end up like Bayview."

102.   The complaint, from an anonymous neighbor, who feared retaliation, asserted that Vagnini had numerous late night parties at which drunken MPD officers from his shift were loud, set off illegal fireworks, and otherwise disturbed the peace. The neighbor further stated that Vagnini was "an ok guy until he gets drunk, loud and cocky with his buddies."

103.   At some point while working on the District 5 proactive Power Shift Unit, Vagnini punched one of his fellow officers, but neither one of them reported it.

104.   From 2006 to 2011, Vagnini was one of the top six "repeaters" in the Milwaukee Police Department with 13 citizen complaints of misconduct.

105.   Because of the stress, Vagnini sought to be transferred to another assignment, but his superior officers talked him out of seeking the transfer because of his success in implementing the CompStat program through stops, searches, and arrests.

*Bleichwehl and Cline*

106.   In July of 2011, Bleichwehl and Cline participated in the arrest of Derek Williams, who died in their custody after they deliberately ignored his repeated anguished cries for medical assistance over a 15-minute period.

107.   According to Bleichwehl, this incident and its publicly-aired aftermath, caused him great stress that made him unable to properly protect prisoners, protect citizens' civil and constitutional rights, or write reliable reports or give accurate testimony.

108.   Neither Bleichwel nor Cline were disciplined for their misconduct in the Derek Williams case, and Bleichwehl was subsequently granted disability status.

16

*MPD Command Staff's Failure to Properly Discipline, Monitor, and Supervise*

109.   In June of 2006, Richard Jerome of the Police Assessment Resource Center issued a report titled "Promoting Police Accountability in Milwaukee: Strengthening the Fire and Police Commission," which made the following findings:

- "The FPC citizen complaint process is broken beyond repair."

- "The FPC complaint process is structurally flawed in ways that make it very difficult for a citizen to establish a claim of misconduct, even if meritorious."

- The results of the FPC citizen complaint process "are troubling, and demonstrate the FPC's structural defects."

- Out of the 550 complaints filed from 1992 to 1999 with the FPC, only six cases resulted in sustained charges against only 8 MPD officers.

- Out of the 437 complaints filed from 2000 to 2005 with the FPC, charges were sustained against only 2 MPD officers.

- The PPD, which reviewed about 91% of citizens' complaints as of 2005, sustained approximately 5%, whereas the typical sustained rate is about 10%.

- There should be significant changes in the procedures for addressing citizen complaints against MPD officers, including an independent monitor.

- "One of the goals of police oversight is to go beyond the review of individual citizen complaints to assess trends or patterns of police misconduct, as well as to address community concerns about police policies and practices."

- The FPC has failed to use its power and fulfill its responsibility to conduct policy reviews of the MPD.

- "While the [FPC] has responsibility for policy review, it has not established a program of systematic monitoring or auditing of the MPD, analysis and study of MPD policies and procedures, or of trends in complaints or the MPD use of force."

- The FPC performed "[n]o audits of FPC citizen complaints, nor any audit or evaluation of complaints received and investigated by MPD."

- The FPC performed "[l]imited collection and analysis of MPD use of force information, or evaluation of MPD's efforts to analyze its own use of force statistics."

17

- The FPC performed "[n]o review of civil actions and tort claims relating to MPD actions."

- It is central to the monitoring process to identify and address trends and patterns in police behavior as well as issues that recur in the investigative process.

110.    Fire and Police Commission (FPC) Executive Director Michael Tobin, who took over in 2007, is a former MPD officer who previously worked at District 5, and a former assistant City attorney.

111.    In 2006, by Tobin's own admission, the citizens' complaint system was ineffective and required improvement and modification; the community did not have confidence in the complaint system.

112.    Prior to 2008, the MPD failed to maintain a computer database of citizen complaints against, or use of force by, MPD officers and the computer system still does not work effectively.

113.    FPC Executive Director Tobin was aware of Defendant Mucha's background since 2005.

114.    Chief Hegerty was aware of Mucha and the problems of his Unit at District 3 as early as 2004.

115.    Despite this knowledge, Hegerty approved Mucha's promotion to Sergeant in 2005.

116.    In 2007, when the media publicly exposed Mucha's excessive force and planting of drugs cases, Chief Hegerty was quoted as saying that Mucha, who was then a Sergeant at District 5, was doing a great job.

117.    In the fall of 2007, Hegerty personally called and emailed Mucha and praised him and his work.

18

118.    Defendant Chief Flynn was also aware of Mucha and his background in 2008 soon after he became Chief.

119.    Defendant Edith Hudson, who was the Captain of District 5 from 2008 to 2011, did not know how Mucha's Unit operated, never went out with them on the street, did not know how the Unit did pat down searches, and made no effort to find out.

120.    Defendant Hudson was not concerned with the court rulings concerning Mucha's extensive bad acts so long as there were no sustained complaints, and she was unaware of any complaints of strip searches while Captain, although L.L.R. made such a complaint in March of 2010, M.T. made one in early 2011, and MPD complaint records show that there were at least 12 complaints for illegal searches, including illegal strip searches, lodged against District 5 officers from September of 2006 to August of 2011.

121.    Defendant Brunson, who was Mucha and the Power Shift's direct supervisor from 2008 to 2010, was also aware of Mucha's background, and claimed to be monitoring him, but in fact he almost never went out on the street with Mucha's Unit, and gave it a great deal of freedom.

122.    Defendant Hudson frequently took Defendants Vagnini and Mucha to CompStat meetings presided over by Defendant Flynn and attended by his command staff.

123.    At these meetings, Vagnini was singled out for praise by the Chief, and the Unit's proactive policing methods were applauded and encouraged.

124.    Since 2008, Mucha had, every six months, evaluated Vagnini's performance, praising him as an extraordinary officer who, with his fellow Unit officers, was responsible for seizing large quantities of drugs and guns.

125.    These evaluations were approved by Mucha's supervising Lieutenants at District

5, who also consistently praised and encouraged Mucha in their evaluations of him.

126.    In the 62 strip/body cavity search complaints that were investigated by MPD's PPD, the only ones that were sustained were the ones that formed the basis for the charging and convictions of Vagnini, Knight, Dollhopf, and Unit officer Kozelek.

127.    After conviction, Vagnini, Knight, Dollhopf, and Kozelek resigned, so that they would not be terminated, and other Unit participants who failed to intervene, to report misconduct, or to obey a direct order, including Michael Gasser, Kopesky, Kuspa, Cline, and Bleichwehl and Sergeants Mucha and Zieger, have not been disciplined by the MPD, and are either still on the job or on disability.

128.    The PPD initiated an investigation of Mucha's supervision in 10 of the illegal strip search cases, but no report or findings were made before Mucha went on disability in 2013, nor has there subsequently been a determination.

129.    A large number of the PPD strip and body cavity search complaints where criminal charges were either refused or not sought, were referred to the IAS of the PPD for consideration of whether internal discipline should be imposed by the MPD.

130.    In each of the cases, Defendant Vagnini was the subject of the investigation for the illegal strip and body cavity searches, together with numerous fellow Unit members who were present at the searches, including those who are named as Defendants herein.

131.    These fellow officers were subjects of the investigations for failing to intervene to stop the searches and for failing to report the illegal searches to a supervisor.

132.    From February through April of 2014, Deputy Inspector Michael Brunson, who was formerly Vagnini and Mucha's supervising lieutenant at District 5, approved the closing of at least eleven of these cases without imposing discipline on any officers. The cases were closed

with the designation "Member Resigned."

133.    With regard to the officers still on the force, the allegations against them were closed because, in Brunson's view, the IAD's preponderance of the evidence standard was not met—a standard which always requires that the victim have corroborative evidence.

134.    Defendant Chief Flynn reviewed, discussed, and approved at least some of these determinations.

135.    With regard to Thoms, who admitted in his IAS interview to witnessing what he now believed to be an illegal strip search by Vagnini, Brunson testified that Chief Flynn had decided that Thoms should be exempt from discipline because of his immunity from criminal prosecution.

136.    The MPD has made no public report to the City Council about its investigations into the strip-search scandal.

137.    Chief Flynn approved multiple promotions of District 5 supervisors Brunson and Hudson despite the strip search scandal at District 5.

138.    The MPD's Early Intervention System (EIP) was essentially non-functional before 2008.

139.    Subsequently, a computer tracking system was installed which would identify problem officers.

140.    However, the identification by the EIP was, by Defendant Flynn's own admission, highly restrictive as it was limited to officers who had a combination of one citizen complaint, one squad car accident, and one use of force complaint within a 90-day period.

*Training on Pat-Down, Strip- and Body-Cavity Searches*

141.    In March of 2012, Chief Flynn stated that the issue of conducting strip searches

21

and body cavity searches was "a serious, serious, training issue."

142. The President of the Milwaukee Police Association stated that the officers involved in the illegal searches were failed by their supervisors because of a lack of training and a lack of checks and balances.

143. The Officer Defendants received no training on when or under what conditions they could conduct strip or body cavity searches.

144. Mucha and Knight have stated that they believed it was proper to put their hands in a person's pants during a pat down search if they felt an object that they suspected to be drugs.

145. Unit members Michael Gasser and Thoms have both stated that it was not unusual for Defendant Vagnini to put his hands in a person's pants, that they saw Vagnini do this, and that they thought at the time that it was okay.

146. Knight testified that officers were not trained on strip and cavity searches, but what they were doing on the street was pursuant to what he understood the MPD policies and practices to be.

147. At his sentencing, Knight's lawyer, speaking on his behalf and with his authorization, made the following statements concerning a lack of proper training that Knight later adopted at his deposition:

> The way Milwaukee police officers were trained either at the academy or once they got on the street, I don't believe that what they thought was correct procedure was in fact correct procedure. And Jake Knight's participation could have been the participation, I believe, of any officer on the department at the time it happened. . . It is amazing to me . . . that there was such a grave question amongst so many police officers of not knowing what can we do, what can we not do. . . There was a lack of education, of knowledge that I believe the general population of police officers had as to these particular issues.

148. This lack of proper training with regard to searches was echoed by at least two other District 5 Officers, including Unit member Martinez, as well as an investigator, one of

whom stated that Vagnini was created, trained and encouraged by the Milwaukee Police Department.

149. Following the John Doe investigation, Defendant Flynn instituted department-wide retraining on the MPD's policies and practices for searches.

*Code of Silence*

150. During the state criminal investigation into the 2004 beating and torture of Frank Jude by MPD officers, former Milwaukee County District Attorney E. Michael McCann stated that the MPD's code of silence hampered the investigation, a frustration that was echoed by Chief Hegerty.

151. In 2006, when MPD Officer Nicole Belmore broke the code of silence and testified against her fellow officers who beat Jude, she was retaliated against by MPD officers who called her a rat, vandalized her property, interfered with her radio communications, and refused to provide her backup.

152. In the strip-search cases, no officer reported Defendant Vagnini or any of his fellow officers for any of the more than 70 now-known illegal strip and cavity searches.

153. Thoms, who grudgingly cooperated with the investigation after being granted immunity from prosecution, was called a "snitch motherfucker" by Vagnini who punched him out, and a bullet was anonymously placed in Thoms' police locker.

154. According to his lawyer, Thoms is now "seen as a rat" by his fellow officers, and he "has no friends on the department."

155. Vagnini and the other Unit officers met repeatedly and attempted to get their stories together for their appearances at the John Doe investigation, and to discourage cooperation at these meetings.

23

156.   Additionally, in their statements to the IAS, they all claimed to have not seen any wrongdoing when accompanying Vagnini on his illegal searches.

157.   According to Vagnini, he is "taking the weight" for his fellow officers, including the Defendants named herein, and the MPD.

158.   In 2013, several MPD officers, including Bleichwehl and Cline, refused to testify during the inquest into the death of Derek Williams, who was in the custody of District 5 officers when he died.

## Count I – 42 U.S.C. § 1983
## Unreasonable Search and Seizure

159.   Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

160.   As set forth in the foregoing paragraphs, the actions of Defendants Michael Vagnini, Jacob Knight, Louis Kopesky, Brian Kozelek, Amy Bartol, and Stephanie Seitz, individually, jointly, and/or in conspiracy, in illegally seizing and detaining Plaintiff without reasonable suspicion or probable cause and illegally searching and physically abusing Plaintiff violated Plaintiff's Fourth Amendment rights to be free from unreasonable searches and seizures, and caused Plaintiff to suffer, *inter alia*, physical pain, extreme mental distress, anguish, humiliation, shame, and fear.

## Count II – 42 U.S.C. § 1983
## Failure to Intervene

161.   Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

162.   As set forth in the foregoing paragraphs, Defendants Jacob Knight, Louis Kopesky, Brian Kozelek, Amy Bartol, and Stephanie Seitz individually, jointly, and/or in conspiracy, had the opportunity, duty, and ability to intervene on behalf of Plaintiff during Defendant Vagnini's invasive and unreasonable stop, detention, arrest, and search of Plaintiff,

24

but failed to do so and thereby caused the injuries to Plaintiff as set forth above.

## Count III – 42 U.S.C. § 1983
### *Monell* Policy, Pattern, and Practice Claim

163.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

164.    The actions of Defendants as alleged above were done pursuant to one or more interrelated *de facto* policies, practices, and/or customs of the City of Milwaukee, its Police Department, its Fire and Police Commission, its Internal Affairs Division, and/or its Police Chief.

165.    At all times material to this complaint, Defendant City of Milwaukee and its Police Department, Fire and Police Commission, Professional Performance Division, Internal Affairs Division and/or Police Chief had interrelated *de facto* policies, practices, and customs which included, *inter alia*: (a) a widespread pattern and practice of illegally stopping, and/or detaining, and/or arresting, and/or strip- and body-cavity searching African-American men; (b) a failure to adequately hire, train, discipline, supervise, monitor, transfer, counsel, and control its police officers, particularly those repeater officers, including, but not limited to, Vagnini, Mucha, Bleichwehl, and Cline, who had histories of serious citizen abuse and/or serious mental-health problems; (c) a police code of silence; and (d) the encouragement, as part of the MPD's CompStat program, of unreasonable, racially-discriminatory stops, searches and seizures, and wrongful detainments and arrests.

166.    The policy, practice, and custom of a police code of silence results in police officers refusing to report instances of police misconduct of which they are aware, despite their obligation to do so, and also includes police officers either remaining silent or giving false and misleading information during official investigations in order to protect themselves or fellow

25

officers from internal discipline, civil liability, or criminal charges, and to perjure themselves in criminal cases where they and their fellow officers have falsely arrested and/or unreasonably searched a criminal defendant.

167.    The *de facto* policies, practices, and customs of failing to properly hire, train, supervise, monitor, discipline, counsel, transfer, and control police officers, the code of silence, and the encouragement of unreasonable searches and seizures and wrongful arrests are interrelated and exacerbate the effects of each other to institutionalize police lying and immunize police officers from discipline.

168.    Before, during, and after the time of the incidents giving rise to this complaint, officers of the Milwaukee Police Department, as a matter of widespread practice so prevalent as to comprise municipal policy, abused citizens in a manner similar to that alleged by Plaintiffs in this Complaint on a frequent basis, yet the Milwaukee Police Department made findings of wrongdoing by officers in a disproportionately small number of cases.

169.    Additionally, the involvement in, and ratification of, the unconstitutional actions of the Defendants by municipal supervisors and policymakers, including Defendant Chief Flynn, Defendant Assistant Chief Hudson, Deputy Inspector Brunson, Defendant Sergeant Mucha, and former Chief Hegerty, further establishes that these acts were part of a widespread municipal policy, practice and custom. This involvement and ratification is further demonstrated, *inter alia*, by the Department's failure for several years to investigate the unconstitutional conduct of the Defendants and other officers or to discipline these officers, including, but not limited to Defendants Vagnini and Mucha, in this and other similar cases of citizen abuse, for their unconstitutional conduct.

170.    The aforementioned policies, practices, and/or customs of failing to hire, train,

supervise, monitor, discipline, counsel, transfer, and control police officers, the police code of silence, and the encouragement and ratification of a racially-discriminatory pattern of unreasonable searches and seizures and wrongful and illegal stops, detentions, and arrests, separately and together, proximately caused injury to the Plaintiff in this case, *inter alia*, because the Defendants had good reason to believe that their misconduct would not be revealed or reported by fellow officers or their supervisors, that these denials would go unchallenged by these supervisors and fellow officers, from the Police Chief, Fire and Police Commission, on down, and that they were effectively immune from disciplinary action, thereby protecting them from the consequences of their unconstitutional conduct. But for the belief that they would be protected, both by fellow officers and by the Milwaukee Police Department, from serious career, criminal, and civil consequences, the Defendants would not have engaged in the conduct that resulted in the injuries to Plaintiff.

171.    Said interrelated policies, practices, and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference, and encouraged the Defendants to commit the aforesaid acts against Plaintiff and therefore acted as a moving force and were, separately and together, direct and proximate causes of said constitutional violations, and injuries to Plaintiff.

172.    As a result of this misconduct, Plaintiff suffered the damages set forth above.

### Count IV – Indemnification

173.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

174.    Wisconsin law, Wis. Stat. § 895.46, requires public entities to pay any tort judgment for damages for which employees are liable for acts within the scope of their

27

employment.

175. At all times relevant to this action, the Defendants committed the acts alleged above in the scope of their employment with the City of Milwaukee.

WHEREFORE, Plaintiff asks that this Court enter judgment in their favor and against Defendants Flynn, Hudson, Mucha, Vagnini, Knight, Kopesky, Kozelek, Bartol, and Seitz awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.


## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated:  August 23, 2017                    Respectfully submitted,


s/ Robin Shellow
Robin Shellow, #1006052
THE SHELLOW GROUP
324 West Vine Street
Milwaukee, WI  53212
(414) 263-4488
tsg@theshellowgroup.com
Attorneys for Plaintiff

s/ Kyle Borkenhagen
Kyle Borkenhagen, #1084544
Rohde Dales LLP
607 North 8th Street, Suite 700
Sheboygan, WI  53081
Telephone:  (920) 458-5501
kborkenhagen@rohdedales.com
Attorney for Plaintiff